WEST INDIA MACHINERY & SUPPLY COMPANY, Plaintiff and Appellee, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellant.

No. R-67-45.     Decided February 21, 1969.

34

*J. B. Fernández Badillo* and *Rafael A. Rivera Cruz, Solicitors General, Elpidio Arcaya, Miguel León Zayas, Assistant Solicitors General,* for appellant. *Segurola & Romero* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On December 9, 1946, the appellee, West India Machinery & Supply Company, hereafter called West India, a family corporation the main stockholder of which was Mr. Raymond W. Garffer—he controlled 86% of the stock issued and outstanding—purchased real property located in the ward Monacillos of Río Piedras, for $43,184.57. The property consisted of a plot of 19.4115 cuerdas and two concrete buildings. During the years 1947 through 1951, West India made improvements consisting mainly of new buildings at a cost of $350,714.25. Therefore, the total cost of the property amounted to $394,389.83. For accounting purposes, the appellee reported annually the sum of $27,896.04, as rental expenses for the buildings and the land used in its business.[1]

In October 1957, Mr. Garffer and other members of his family organized the Garlam Enterprise Corporation, hereafter called Garlam, the main purpose of which was to acquire real property to be used in the rental business. On January 15, 1958, Mr. Garffer gave his three minor children stock representing 45% of the stock issued by Garlam. On the same date Garlam bought the above-mentioned real property from West India for the sum of $575,000, for which Garlam made an initial payment of $25,000 and the balance was deferred, to be paid in 25 annual installments of $35,206.60, including amortization of capital and payment of interest. Simultaneously, Garlam leased an area of 2.639 cuerdas and the above-mentioned buildings to West India for

---

[1] This accounting entry did not affect the tax liability, since a similar amount was reported as income.

an annual rental of $60,000 for 1958 and 1959, and of $65,000 for 1960.[2]

For the taxable years 1958, 1959 and 1960—from October 1 to September 30 of the following year—West India claimed the total amount of the rentals paid to Garlam as a necessary and ordinary expense of its business, § 23 (a) (1) (A) of the Income Tax Act of 1954, 13 L.P.R.A. § 3023 (a) (1) (A). In readjusting this item the Secretary set $42,790.22,[3] as the maximum annual rental deductible, as indicated below:

Cost of the real property

| | |
|---|---|
| Cost of buildings | $350,714.25 |
| Cost of 2.639 cuerdas | 5,870.96[4] |
| | $356,585.21 |
| 12% of $356,585.21 | $42,790.22 |

The trial court described the controversy submitted for decision as follows: "The deficiency item . . . identified as 'expenses for the rental of premises' results from the Secretary's contention that the rental paid by the plaintiff West India Machinery & Supply Company to Garlam Enterprises Corporation for the lease of business premises is not reasonable and that the rental was paid according to a plan to transfer income from one corporation to another, both of which corporations belong to the same person and, therefore, a determination as to a reasonable rental should be made and

---

[2] The net result of these transactions was that in 1958 and 1959 West India paid to Garlam $24,793.40 in excess of the amount the lessor paid to lessee as principal and interest of the time-payment price.

[3] As a result of the investigation the sum of $33,896.04 was originally allowed as reasonable annual rental, but during the trial the deduction allowed was increased to $42,790.22. See footnote 1 of the opinion of the trial court.

[4] This result was obtained by dividing the original cost to West India by the total capacity of 19.4115 cuerdas, which results in a unit cost of $2,249.69 per cuerda.

the Secretary may object to the amount of rent paid and reduce it to a reasonable figure." After considering the evidence introduced, the trial judge held that the rental claimed was reasonable and, therefore, entirely deductible.

In his petition for review filed before this Court the Secretary of the Treasury appears to alter the emphasis in his position on the partial disallowance of the rentals, and attempts to maintain that because of the lack of a legitimate business reason in the sale and subsequent lease of the property, West India is not entitled to claim, as necessary business expense, the *total* amount of rentals paid. In the alternative, he insists on the unreasonableness of the rentals claimed.

1. In *Ramón* v. *Sec. of the Treas.*, 84 P.R.R. 423, 429–431 (1962), we stated that, during the stage of judicial review, the Secretary of the Treasury may adduce additional or inconsistent grounds to support his deficiency determination, but that in such case the grounds must be alleged by way of affirmative defense to allow the taxpayer to prepare himself adequately to face the same. We said, further, that in regard to these additional grounds, the presumption of correctness does not protect the Secretary's action, and because it is an affirmative defense, said officer has the burden of proof to establish it.[5] See, Alonso, *La Presunción de Corrección en las Determinaciones del Secretario de Hacienda*, 32 *Rev. Jur. U.P.R.* 223 (1963).

It appears from the record that the deficiencies notified to the appellee corporation resulted from the partial disallowance of the deduction, of the rentals claimed as a

---

[5] In *West India Mach.* v. *Sec. of the Treas.*, 89 P.R.R. 113, 122 (1963), we cited with approval the rule established in *Ramón* v. *Sec. of the Treas.*, *supra*. We note that the language used could give the impression that when the Secretary timely adduces in his answer to the complaint, through an affirmative defense, additional grounds to support a deficiency, he is protected by the presumption of correctness. We ratify, once more, that in this situation the presumption of correctness does not protect the administrative determination.

necessary business expense. Although the returns[6] were not offered in evidence, it appears from the computations filed that the adjustments in this regard were $18,615.30 for 1958, $26,103.96 for 1959, and $31,103.96 for 1960. This is the administrative action that is challenged. In the answer to the complaint no affirmative defense was adduced and in the course of the trial not only is no attempt made to show that the rental claimed as an expense is not wholly deductible, but the $33,896.04 rental administratively granted as reasonable at the beginning of the controversy was increased to $42,790.22. It was after the case had been decided that the question that the sale transaction did not respond to business reasons and purposes and that, therefore, the total amount of the rentals was not deductible was raised for the first time with crystal clearness through reconsideration. No evidence was introduced by the Secretary either in the hearing of the case on the merits or to substantiate the allegations raised in the motion for reconsideration. He relied on the stipulation of certain facts and on the evidence introduced by the appellee corporation. At this stage of the proceedings we cannot take the position now requested without placing the taxpayer at an obvious disadvantage. As it was done by the trial court, we shall examine the controversy only to determine whether the rentals agreed upon and paid constitute reasonable rentals.

■■ 2. In general terms, the deduction of rentals paid "as a condition to the continued use or possession . . . of property to which the taxpayer has not taken or is not taking title or in which he has no equity," (§ 23(a) (1) (A) of the Income Tax Act, *supra*), is authorized. That the rental be reasonable in order to be deductible is not required by law, but it has been so established by judicial interpretation in order to prevent the making of other payments, particularly

---

[6] Again we advise the trial courts of the desirability of requiring the introduction in evidence of the income tax returns and the deficiency notices. *Rodríguez* v. *Sec. of the Treasury*, 89 P.R.R. 718 (1963).

the distribution of profits, under the guise of rent payments. Hence, when there is a close relationship between the parties to a lease agreement and the contract is not the lawful and proper result of an arm's length dealing—a transaction in which it is assumed that the parties have adverse economic interests—the deduction of only that portion of the rent that would have been required in a bona fide transaction had the parties been unrelated is allowed.[7] 2 Prentice Hall, Federal Taxes, par. 11,832 (1968 ed.); 4A Mertens, Law of Federal Income Taxation, § 25.110. *Potter Electric Signal and Manufacturing Co.* v. *C.I.R.*, 286 F.2d 200 (1961); *Midland Ford Tractor Company* v. *C.I.R.*, 277 F.2d 111 (8th Cir. 1960); *Brown Printing Co.* v. *Commissioner of Internal Rev.*, 255 F.2d 436 (5th Cir. 1958); *Smith* v. *United States*, 278 F.Supp. 230 (1968). *Ernest V. Berry*, 64,181 P-H Memo T.C. 1964-181.

■■ One of the transactions most frequently giving rise to the consideration of these factors is that of sale and lease-back agreements. It should be noted that the mere fact that there is some relationship between the parties does not prevent the allowance of the deduction. However, when the parties to the transaction have common interests, it is justified to make a careful examination of the contractual agreements to determine whether in effect they are a device used to accomplish the distribution of income with a view to deter-

---

[7] In similar situations we have applied identical criteria: on the reasonableness of deductions, *West India Mach.* v. *Sec. of the Treas.*, 89 P.R.R. 113, 122 (1963); *Carrión* v. *Treas. of P.R.*, 79 P.R.R. 350, 357 (1956); *Clínica Juliá* v. *Sec. of the Treasury*, 76 P.R.R. 476, 495 (1954); on the consideration of transactions between closely related parties, *West India Mach.* v. *Sec. of the Treas., supra; Clínica Juliá* v. *Sec. of the Treasury, supra; P.R. Ry., L. & P. Co.* v. *Buscaglia, Treas.*, 62 P.R.R. 572, 586 (1943); on implicit or hidden distribution of profits and dividends, *Fernández* v. *Sec. of the Treas.*, 95 P.R.R. 417, 420 (1967); *Central Igualdad, Inc.* v. *Sec. of the Treas.*, 83 P.R.R. 44, 55 (1961); on the necessity of there being a lawful business transaction, *Nieto* v. *Registrar*, 91 P.R.R. 658, 662 (1965).

mining a lesser tax liability. All the circumstances involved must be the object of examination to find out whether, in effect, the sale and lease-back agreement responds to a legitimate business reason.[8] Prentice Hall, *op. cit.*, par. 11,835; Mertens, *op. cit.*, § 25.111. *Shaffer Terminals, Inc.*, 16 T.C. 356 (1951).

In the situation herein examined it is evident that there is a close relationship between both corporate entities because of the identity of their stockholders and the actual control that Mr. Garffer undoubtedly exercises in their administration. In this regard we disagree with the weighing of the trial court, which attributed undue importance to some refinements of title. It is precisely the existence of this factor that justifies our consideration of the reasonableness of the rental agreed upon in the light of the economic factors for such determination.[9]

■ In support of his position that this is not a case of a legitimate transaction, the Secretary of the Treasury points out emphatically, that the present rental of $60,000 exceeds twice the amount West India reported in its books as cost of the use of the facilities before the sale. It suffices to say that the appellant himself refers to this latter amount as merely an adjustment figure in appellee's accounting and that it is not of special significance in regard to the market value of the leasehold. If there were any doubt on this matter, it would be sufficient to consider that, according to the formula for the determination of market value used by the Secretary— twelve percent of the original price paid by West India—the

---

[8] The doctrine of legitimate business reason was originated in *Gregory* v. *Helvering,* 293 U.S. 465 (1935), with special application in cases of corporate reorganizations, but it has been extended to other fields of the tax law, especially to sale and lease-back agreement cases.

[9] The lack of evidence on the conditions of the lease agreement does not facilitate our task. Also, the returns of West India were not filed, although Garlam's returns were filed, in order to determine the tax impact of the alleged diversion of funds.

annual rental would amount to $42,790.22, not to $27,896.04. Also, it has been argued that the amount of $60,000 determined as annual rental has been developed to allow West India to pay the annual installments of $35,206.60 for amortization of capital and payment of interest and that the $24,703.40 balance is more or less the rental originally paid. In this computation the annual payments of property taxes and insurance that the lessor is bound to make are ignored.[10]

The other evidence introduced preponderantly supports the determination on the reasonableness of the rentals made by the trial court. Let us see. Applying the same method used by the Secretary to determine a maximum rental to the leased property—derived from § 6 (f) of the Reasonable Rents Act, as amended by Act No. 67 of June 19, 1964, 17 L.P.R.A. § 186 (f)—12 percent per annum of the cost for the lessor Garlam would be, including the whole plot, $69,000 (12% of $575,000). We have already seen that when the $42,790.22 deduction was allowed this amount was reached by giving the buildings a market value of $350,714.25, the original cost thereof and to the land a value of $5,870.96 based on the original unit price per cuerda paid by West India. However, in this last aspect, a basic fact was ignored: that the area of the plot that was the object of the lease is, on account of its location, access, facilities and economic utilization, the most valuable part of the entire area of the property, and that the unit price, without more, does not adequately represent its market value.

In our judgment, the study of valuation prepared by the expert, Eng. Orlando Flores, constitutes the best evidence presented concerning the market value of the leased property. He considered the 2.69 cuerdas leased as a separate unit, without reference to unit values as far back as 1958, and in

---

[10] In the taxable year of 1959, according to Garlam's income tax return, these payments amounted to: property taxes, $7,718.37; insurance, $2,035.34. A $7,014.24 reserve for depreciation was made.

regard to the vital factors of vicinity, location, best use, similar sales and the analysis of the market, as well as the cost of replacement of the leased buildings as of January 15, 1958, the date the lease agreement was closed. His estimate was of a $62,400 rental up to October 5, 1959, when, as a result of an addition of a 7,000 square meter[11] plot, the rental was increased to $70,100.[12] This disposes of the claim on the part of appellant to the effect that the trial judge used an erroneous basis—he refers to the area of the property—to determine the reasonableness of the rentals.

It is undeniable that in the matter of valuation and estimates different results may be obtained, depending on the relative importance attributed to each one of the factors considered for the determination of the market value. A detailed analysis of the evidence leads us to conclude that the taxpayer overcame the Secretary's determination with reasonable and sufficient evidence. *Reyes* v. *Sec. of the Treas.*, 84 P.R.R. 574 (1962). Therefore, the taxpayer shall prevail.[13]

The judgment appealed from rendered by the Superior Court, San Juan Part, on October 14, 1966, will be affirmed.

---

[11] On October 5, 1959, Garlam leased to West India an additional plot of 7,000 sq. meters which was used to store heavy machinery. The size of the plot leased from that date was 4.42 cuerdas.

[12] The Office of Economic Stabilization Administration determined that a reasonable monthly rental for the property was $7,212.70; that is, in excess of $85,000 per year.

[13] The same conclusion is reached whether the ordinary rules of procedure of the burden of proof or those regarding the overcoming of the presumption of correctness of the administrative determination, are applied. That relieves us from considering whether, within the method provided for the judicial review of the acts of the Secretary of the Treasury, the "presumption of correctness" must be maintained.