Mathew J. SPIESMAN, Jr., and Mary Spiesman, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15752.

United States Court of Appeals Ninth Circuit.

Oct. 17, 1958.

Paul Castoldi, Francis J. Butler, Spokane, Wash., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Marvin W. Weinstein, Robert N. Anderson, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HEALY and FEE, Circuit Judges, and JAMES M. CARTER, District Judge.

**JAMES M. CARTER, District Judge.**

This case involves the validity of a family partnership, Section 191 of the Internal Revenue Code of 1939, [as added by Section 340(b) of the Revenue Act of 1951, c. 521, 65 Stats. 452], 26 U.S.C.A. § 191 and Section 3797 of the Internal Revenue Code of 1939 [as amended by Section 340(a) of the Revenue Act of 1951, supra], 26 U.S.C.A. § 3797. The texts of the statutes are set forth in the margin.[1]

---

1. Internal Revenue Code of 1939:
   "§ 191. Family partnerships

"In the case of any partnership interest created by gift, the distributive share

### The Proceedings Below

The petitioner, Mathew J. Spiesman, Jr., and his wife, filed joint federal income tax returns for the calendar year 1951 and 1952, and the family partnership, "Spiesman & Sons" filed information returns on Form 1065 for the same year. The matters in controversy concern only one month of 1951, December 1st to December 31st, and all of 1952. The petitioner, Mary Spiesman, the wife, is a party solely because she and her husband filed joint returns for the years in question. She is not otherwise involved in this controversy.

The Commissioner determined deficiencies existed in the return of income and tax, notice was mailed, and the taxpayers filed a petition with the Tax Court for redetermination of deficiencies, within the statutory time. The case was heard by the Tax Court on a record consisting in part, of stipulated facts and in part of oral testimony. Deficiencies in income tax were found in the amounts of $2,155.22 and $14,056.20 for the years of 1951 and 1952, respectively. Written findings of fact and opinion were filed, 28 T.C. No. 62. The decision was reviewed by the full Tax Court. The Tax Court held that the five minor children of the petitioner, Mathew J. Spiesman, Jr., were not bona fide partners in the partnership known as "Spiesman & Sons" during the years 1951 and 1952, within the meaning of the sections of the Internal Revenue Code set forth above, and that income reported for the children as partners on Form 1065, should have been included in the return of Spiesman Jr. The case comes here on petition to review the decision of the Tax Court.

### The Facts

Prior to 1950 Spiesman Jr., owned certain slot machines located in the Gem State Club of Idaho. Under agreement with the club, Spiesman received 20% of the receipts from the slot machines; he was also President and Manager of the club. On February 1, 1950, Spiesman Jr. and his father, Mathew Spiesman, Sr., hereafter referred to as Spiesman Sr., entered into a partnership known as "Spiesman & Spiesman" for the purpose of operating amusement devices. The agreement recited that "the assets to be taken over by the partnership are in the possession and owned by the. partner, Mathew J. Spiesman, Jr." and that Spiesman Sr., "agrees to pay a

---

of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service. For the purpose of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The 'family' of any individual shall include only his spouse, ancestors, and lineal descendants, and any trust for the primary benefit of such persons." (Revenue Act of Oct. 20, 1951, c. 521, Title III, § 340(b); 65 Stat. 452, 511; 26 U.S.C.A. § 191.)

"§ 3797. Definitions

"(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof— * * *

"(2) Partnerships and partner. The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization. A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person." Revenue Act of Oct. 20, 1951, c. 521, Title III, § 340(a); 65 Stat. 452; 26 U.S.C.A. § 3797.)

sum equal to one-half of the value of the assets;" that the partners should bear equally all expenses, fees, licenses, permits and share the profits one-third to Spiesman Sr., and two-thirds to Spiesman Jr., the petitioner.

Spiesman Jr., claims to have learned in October of 1951 about the amendments of the Internal Revenue Act of 1951 referred to above, and on or about December 1st, a new partnership agreement was entered into between Spiesman Sr., Spiesman Jr., and the latter's minor children, who on or about that date were of the following ages: Mathew Joseph, 11, Philip James, 8, Leonard John, 6, Mathew James III, 5, Francis Edward, 1.

The record shows that Spiesman Sr. was 80 years of age in 1956, the date of the Tax Court hearings and would have been about 75 years of age in 1951. He testified he made gifts to his son, Spiesman Jr., and gifts to the children of Spiesman Jr., consisting largely of stock at times from 1945 to 1951, and that in December of 1951, he gave each of the five children an interest in the equipment of "Spiesman & Spiesman," the partnership of Spiesman Jr. and Spiesman Sr. Spiesman Jr., testified he gave the five children part of his interest in the old partnership.

The result reflected in the partnership agreement of "Spiesman & Sons" showed that Spiesman Jr. claimed a ⅗ interest, Spiesman Sr. a ⅕ interest and each of the five children claimed a ⅕ interest in the partnership of "Spiesman & Sons."

There is controversy over this agreement. It recited that it was entered into between Spiesman Sr., Spiesman Jr., and the five minor children, and was signed by Spiesman Sr., Spiesman Jr., and by Spiesman Jr., as guardian for the five minor children. It is without dispute that Spiesman Jr., had been appointed in 1947 as guardian for the first four of the minor children, but he was not appointed as guardian for the youngest, Francis Edward until October of 1953. He was therefore not the guardian of Francis Edward at the time the agreement was purportedly signed on behalf of said minor.

More important, paragraph Second of the partnership agreement read: "At the time of this agreement the assets to be taken over by the partnership are in the possession and owned by the partner(s), Mathew James Spiesman Jr., (and Mathew James Spiesman Sr.) * * *". The words and letters within the brackets were interlineations inserted by Spiesman Jr., in 1953, after the execution of the agreement and after the initiation of the investigation of Spiesman Jr.'s income tax returns for the years involved. Thus, as originally written, the agreement recited that the assets were owned by Spiesman Jr.

The partnership returns filed by the new partnership, "Spiesman & Sons" for the period December 1, 1951 to December 31, 1951, showing net earnings distributable to the partners in the sum of $3,254.30; and for the year 1952 showed net earnings distributable to the partners in the sum of $46,021.71. This income was derived from the operation of slot machines and amusement devices, most of which were located in the Gem State Club and which had continued to be operated under the original agreement as to percentages, entered into between Spiesman Jr., and his father, prior to the formation of the partnership of "Spiesman & Sons." Licenses for the operation of the machines were obtained and paid for by the Gem State Club or by others at other locations where they were placed. Spiesman Jr., spent part of his time operating the affairs of "Spiesman & Sons", and the major part of his time as Manager of the Gem State Club, for which he received a salary. The Tax Court found that "Capital is a material income-producing factor of the Spiesman & Sons partnership and the salary paid Spiesman for managing the affairs of the partnership is reasonable."

From 1947 to 1952 no inventories or accountings were filed by Spiesman Jr., as guardian for the four older boys. In October of 1953, after the initiation of the investigation of the income tax re-

turns for the tax years involved, Spiesman Jr., as guardian, filed inventories and accounts for the four older boys. The accounts were approved, allowed and settled by the Probate Court. In October 1953, he was appointed guardian for the youngest boy, and inventories and accounts were filed for the estates of all five boys in 1954, 1955 and 1956 for the respective preceding years.

The capital account shown on the partnership return for the portion of the year 1951, beginning December 1st, was as follows:

|  | Beg. of Period | End of Period |
|---|---|---|
| Mathew J. Spiesman, I | $ 100.00 | $ 461.59 |
| Mathew J. Spiesman, II | 2,774.63 | 3,859.39 |
| Mathew J. Spiesman, III | 100.00 | 461.59 |
| Philip Spiesman | 100.00 | 461.59 |
| Michael Joe Spiesman | 100.00 | 461.59 |
| Francis Spiesman | 100.00 | 461.59 |
| Leonard Spiesman | 100.00 | 461.59 |

The partnership return filed for 1951 showed net earnings in the amount of $3,254.30, distributable as follows:

| Mathew J. Spiesman, I | $ 361.59 |
|---|---|
| Mathew J. Spiesman, II | 1,084.76 |
| Mathew J. Spiesman, III | 361.59 |
| Philip Spiesman | 361.59 |
| Michael Joe Spiesman | 361.59 |
| Francis Spiesman | 361.59 |
| Leonard Spiesman | 361.59 |

No withdrawals were made from the capital accounts of the partners during the period involved in 1951, namely the month of December.

The partnership return (Form 1065) for the year 1952 showed net earnings in the amount of $46,021.71, distributable as follows:

| Mathew J. Spiesman, I | $ 4,846.85 |
|---|---|
| Mathew J. Spiesman, II | 16,940.61 |
| Mathew J. Spiesman, III | 4,846.85 |
| Philip Spiesman | 4,846.85 |
| Michael Joe Spiesman | 4,846.85 |
| Francis Spiesman | 4,846.85 |
| Leonard Spiesman | 4,846.85 |

For the year 1952 the capital account of each partner, showing the amount at the beginning of the year, the withdrawals and the capital account at the end of the year, were as follows:

|  | Capital Acct. Beg. of Year | Withdrawals | Capital Acct. End of year |
|---|---|---|---|
| Mathew J. Spiesman, I | $ 461.59 | $ 3,688.83 | $1,619.61 |
| Mathew J. Spiesman, II | 3,859.39 | 16,768.68 | 4,031.32 |
| Mathew J. Spiesman, III | 461.59 | 4,690.16 | 618.28 |
| Philip Spiesman | 461.59 | 2,592.80 | 2,715.64 |
| Michael Joe Spiesman | 461.59 | 2,593.25 | 2,715.19 |
| Francis Spiesman | 461.59 | 3,448.01 | 1,860.43 |
| Leonard Spiesman | 461.59 | 4,950.96 | 357.48 |

Computations show, taking the capital account at the beginning of the partnership of Spiesman & Sons, on December 1, 1951, and adding the distributable earnings for 1951, that the capital account for the year 1951, was accurately computed; and that adding the distributable earnings for 1952 and taking into account the withdrawals, the capital account for the end of the year 1952, was accurately computed.

According to the inventory and accounting record filed by Spiesman Jr., as guardian of the estate of his five sons, the following withdrawals on behalf of the sons was made by him as guardian from "Spiesman & Sons."

|                | 1952         | 1953      | 1954     | 1955 |
|----------------|--------------|-----------|----------|------|
| Mathew James   | $5,690.16    | $3,124.20 | $ 270.73 | None |
| Philip James   | 1,592.80     | 3,557.13  | 2,005.33 | None |
| Michael Joseph | 1,593.25     | 3,626.12  | 1,936.62 | None |
| Francis Edward | (not shown)  | 3,079.35  | 291.94   | None |
| Leonard John   | 3,848.01     | 3,500.16  | 269.85   | None |

Thus, there were discrepancies between the withdrawals shown in the capital account for 1952, and as shown on the guardianship records for the same year. It will be noted that the withdrawals on behalf of Michael, the oldest boy, is exactly $1,000 greater, as shown by the guardianship records than as shown by the capital account. The withdrawals on behalf of Philip and Michael, the next two sons, were exactly $1,000 less, as shown by the guardianship records, than as shown on the capital account. As to the youngest boy, Leonard, the withdrawals as shown by the guardianship records were $1,102.95 less than those shown in the capital account.

The funds withdrawn were in part, deposited to the savings account of the children, used to pay life insurance premiums, the policies being payable to the mother of the children, and in part used to pay income taxes and to purchase additional securities for them. The Tax Court found, "None of these funds insofar as the accounting reports filed with the Probate Court reveal, were used for the support or living expenses of any of the minor children."

The Tax Court found that the withdrawals on behalf of the children were not equal to the one-ninth interest purportedly owned by each child, and that unequal withdrawals were also shown by the guardianship records for 1952, 1953 and 1954. In explaining the discrepancies, where withdrawals were in some cases more and in some cases less than the distributable share of the child, Spiesman Jr. testified that certain of the boys had income from stocks, and that he tried to "even up" the cash account of each child, so that if he was killed or died, the child would not say, "Well my dad was not very fond of me, he didn't leave me anything." The Tax Court found that such conduct did not conform to the purported partnership interest of the children, or to the duties of a guardian if the partnership interests were bona fide, but that they were the action of a parent who "owned, controlled and distributed his own funds according to his own desires and ideas."

In 1947, the Legislature for the state of Idaho enacted a statute [S.L.1947, c. 151; sections 50–1501 to 1510 inclusive, Idaho Code] providing it should be lawful for any person to own and operate coin operated amusement devices within the corporate limits of any incorporated city or village after having secured a license. The term "person" was defined to include "an individual person, partnership, corporation or association." The law further provided that no such device

might be operated on any premise except those *owned or leased* by the licensee, and that *no person other than the licensee* "may have any legal, equitable or financial right, title or interest in such device * * * nor receive any rental or remuneration therefrom or from the operation thereof." Subsequently, on December 3, 1953, in State v. Village of Garden City, 74 Idaho 513, 265 P.2d 328, the law was declared unconstitutional by the Idaho Supreme Court. See State ex rel. Nielson v. City of Gooding, 75 Idaho 36, 266 P.2d 655. Also, in 1953 the statute was repealed [S.L.1953, c. 62, section 1, page 82].

The machines here in question, were operated at the Gem State Club or other locations not shown to have been owned or leased by Spiesman Jr., the partnership or any members of the "Spiesman & Sons" partnership. All licenses were obtained and paid for by the Gem State Club or the operators of other places where the machines were located. The Tax Court concluded that even if the statute had not been declared unconstitutional, the minor children, partners in "Spiesman & Sons" could not be considered as having any "legal, equitable or financial title or interest" in such devices, and that they could not legally receive any rent or remuneration from the operation of such device.

The Tax Court also found that the partnership agreement of "Spiesman & Sons" was "to say the least" inconclusive with respect to the transfer of title to the machines. No other written transfers of title appear in evidence, and the books and the records of the partnership were not placed in evidence. The partnership returns filed by "Spiesman & Sons" for 1951 and 1952 showed that the full value of the machines were included in the capital account of Spiesman Jr., and no interest in such machines was included in the capital account of any of the children.

The Tax Court found, "Considering all the facts and circumstances herein, we hold that the five minor children of the petitioner were not the real owners of capital interests in the partnership, and were not bona fide partners in the Spiesman & Sons partnership during the taxable years 1951 and 1952."

Spiesman Jr.'s contentions herein may be summarized as follows:

1. The Tax Court failed to give full import to Sections 340(a) and (b) of the Revenue Act of 1951 (supra).

2. The Tax Court relied on and misapplied the Culbertson case, Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, in view of the provisions of the Revenue Act of 1951.

3. The Tax Court erred in its factual findings,

(a) That the Spiesman & Sons partnership was a "sham."

(b) In relying on the interlineations made in 1953 on the partnership agreement.

(c) In considering that the partnership agreement showed no clear transfer of title of the machines to the children and the fact that the full value of the machines were shown in the capital account of Spiesman Jr.

(d) In considering the unequal withdrawals from the capital account of the children, and not giving full weight to the approval of the Probate court of the subsequent accounting in the children's guardianship estates.

(e) In relying on the fact that there was no accounting or supervision of the guardianship estates during the taxable years in question.

(f) In relying on the Idaho law concerning slot machines and the holding of the State court that the law was unconstitutional.

4. The Tax Court erred in holding the entire income assigned to the minor children in the returns should be taxed to Spiesman Jr., rather than in proper proportions to Spiesman Jr. and his father, Spiesman Sr.

Points I and II in our summation of the contentions of Spiesman Jr., will be

considered together, points III and IV separately.

## I.

### The Tax Court Properly Applied the Law.

The Supreme Court in Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659, had in 1949 laid down the test for determining the validity of family partnerships for tax purposes. This test was one of fact and depended on "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." (337 U.S. at page 742, 69 S.Ct. at page 1214). The Supreme Court also pointed out what it termed an "error in emphasis" (337 U.S. at page 741, 69 S.Ct. at page 1214) by the Tax Court in requiring that an essential to membership in a valid family partnership was a contribution by each member of either vital services or original capital. The court further pointed out, (337 U.S. at page 745, 69 S.Ct. at page 1216) that its previous decision in Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, "did not say that the donee of an intra-family gift could never become a partner through investment of the capital in the family partnership;" and that at page 746 of 337 U.S., at page 1216 of 69 S.Ct., the Supreme Court said "that existence of the family relationship * * * is simply a warning that things may not be what they seem", and that "transactions between members of a family will be carefully scrutinized" to determine whether the donee partner acquired sufficient dominion and control over the property to influence the conduct of the partnership in the disposition of its income and thus became a "true partner."

Congress in the Revenue Act of 1951 added to the Internal Revenue Code of 1939, section 191 (supra), referring specifically to a partnership interest "created by gift" and providing that the distributive share of the donee with certain express exceptions, should be includible in his gross income. At the same time Congress added section 3797 (a) (2) to the Internal Revenue Code of 1939, expressly defining a partner, to-wit:

"A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, *whether or not such interest was derived by purchase or gift from any other person.*" [Emphasis added.]

A report of the Committee on Ways and Means of the House of Representatives on these amendments to the Internal Revenue Code in 1939, [H.Rep. No. 586, 86th Cong., 1st Sess. pp. 32–34; (1951–52 Cum.Bull. 357, 380–381)] stated in part:

"Your committee's amendment makes it clear that, however the owner of a partnership interest may have acquired such interest, the income is taxable to the owner, if he is the real owner. If the ownership is real, it does not matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner."

The report further referred to various cases in the courts "which suggest that an intrafamily gift of a partnership interest, where the donee performs no substantial services, will not usually be the basis of a valid partnership for tax purposes. * * * "

As to the effect of the amendment, the committee report concluded in part:

"The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham * * The same standards apply in determining the bona fides of alleged family partnerships as in determin-

ing the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale."

■ Thus Congress clearly stated that recognition of membership in a family partnership could not be denied merely because the partner had acquired his interest by a gift from a member of his family, if in fact a bona fide gift was intended and made. The law was not changed in any respect as to the requirement existing under the Culbertson case, supra, that the courts carefully scrutinize such transactions, determine the bona fides thereof, and determine whether the transaction was merely a sham for tax purposes, or whether the donor had in fact relinquished dominion and control over the purported gifts.

There is nothing in the Tax Court decision to indicate that they misapplied the law. No criticism was directed at the fact that the interest of the minor children of the partnership was claimed to have arisen by gifts from the father and grandfather. The Tax Court decision, holding the family partnership invalid for tax purposes, was not based upon this ground.

## II.

### The Factual Determination of the Court Was Not Clearly Erroneous and Must Be Upheld.

The decision of the Tax Court was based entirely on the consideration of the facts and circumstances. The Tax Court found that the transaction was in fact a sham and that five minor children were not bona fide partners during the taxable years within the meaning of the law.

In reaching this decision, the Tax Court pointed to various circumstances which we hold it might rightfully consider. Among others it considered the interlining of the partnership agreement; that the agreement showed no clear transfer of title of the slot machines to the children and that the full value of the machines were included within the capital account of Spiesman Jr.; that there were unequal withdrawals from the capital account of the children; that Spiesman Jr., had testified this was done to "even up" the amounts received by the children, taking into consideration other gifts and income; that there were no accountings or supervision of the guardianship assets during the tax years in question; and that under Idaho law, the children as purported partners, could not legally own interests in the business income-producing assets, namely the slot machines; that ownership of such machines was only legal after license was secured and that such machines could not be operated on premises other than those owned by the licensee; and that no person other than the licensee could have any interest whatever in such machines.

■■ The Tax Court is a trier of fact. Based on the record before it, it made findings of fact and ultimately found that bona fide gifts were not intended or made, and that the children were not bona fide partners in the business during the years 1951–1952.

Such factual determinations by the Tax Court will not be disturbed on appeal unless they are found to be "clearly erroneous," Smith v. Westover, 9 Cir., 1956, 237 F.2d 201, 203; Cf. Parker v. Westover, 9 Cir., 1957, 248 F.2d 490. As shown above, we are satisfied that the findings of the Tax Court were "not clearly erroneous" but were supported by the facts in the record.

## III.

There Is No Merit To Petitioners' Contention That Part of the Income Reported for the Children, Should Be

Charged Back To Spiesman Sr., Rather Than Petitioner Spiesman Jr.

The opinion of the Tax Court stated that petitioners, at the hearing and on briefs, have conceded or abandoned all other issues raised by the pleadings, except one, namely whether the five minor children were partners during 1951 and 1952. No mention was made before this court in petitioners' briefs or arguments that such recital in the opinion of the Tax Court was not correct.

The partnership agreement of February 1, 1950, between Spiesman Jr. and his father, Spiesman Sr., recited "the assets to be taken over by the partnership are in the possession and owned by the partner, M. J. Spiesman Jr." The agreement further provided that Spiesman Sr., "agrees to pay a sum equal to one-half of the value of the assets."

 There is testimony in the record by Spiesman Sr., that he purchased and acquired one-half of the assets in the partnership of "Spiesman and Spiesman," and that he gave part of his interest to the minor children. Standing against this testimony is the second partnership agreement for "Spiesman & Sons," dated December 1, 1951, and signed by Spiesman Sr., which at the time of its execution recited, "The assets to be taken over by the partnership are in possession and owned by the partner, Spiesman Jr." The agreement further provided for cash contributions, and Spiesman Sr. is listed along with the children as having contributed $100. The partnership returns on Form 1065 for each year, show as distributable to Spiesman Jr. the identical amount as distributable to each of the minor children, who likewise had made a $100 contribution. The capital account for 1951, shows only the $100 contributed by Spiesman Sr. and $2,774.63 in the account of Spiesman Jr., representing the machines. Likewise the capital account for 1952 again shows Spiesman Sr., as having only the capital and earnings attributable to his ⅙ interest from his $100

contribution, and the value of the machines still in the capital account of Spiesman Jr.

The Tax Court, as a finder of fact, was entitled to conclude that Spiesman Sr. did not have any interest in the machines and therefore properly concluded the income allocated to the children should be attributable to Spiesman Jr.

The Tax Court in its opinion stated, and thus found, that "The full value of the machines was shown as included in the capital account of the petitioner." This is equivalent of a finding that none of the value of the machines were shown in the capital account of Spiesman Sr.

We conclude that the Tax Court decision was correct and the judgment should be and is affirmed.