JOYCE ANN CIRELLI, ET AL.,[1] PETITIONERS *V.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 14917–82—14919–82, 14963–82,     Filed February 28, 1984.
14991–82,  14992–82, 15244–82.

*Howard Levinton* and *Steven K. Fedder*, for the petitioners.
*John F. Dean*, for the respondent.

TANNENWALD, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioners | Docket No. | Year | Deficiency |
| --- | --- | --- | --- |
| Joyce Ann Cirelli | 14917–82 | 1973 | $129.74 |
| | | 1974 | 171.44 |
| | | 1975 | 1,723.54 |
| Lucia Ann Cirelli | 14918–82 | 1973 | 129.74 |
| | | 1974 | 320.11 |
| | | 1975 | 1,546.55 |
| Mary Cirelli | 14919–82 | 1973 | 129.74 |
| | | 1974 | 321.00 |
| | | 1975 | 1,545.14 |
| Jack Leone and Barbara Leone | 14963–82 | 1975 | 2,387.15 |

---

[1]Cases of the following petitioners are consolidated herewith: Lucia Ann Cirelli, docket No. 14918–82; Mary Cirelli, docket No. 14919–82; Jack Leone and Barbara Leone, docket No. 14963–82; John Cirelli, docket No. 14991–82; Charles J. Cirelli and Martha C. Cirelli, docket No. 14992–82; Charles J. Cirelli & Son, Inc., docket No. 15244–82.

| Petitioners | Docket No. | Year | Deficiency |
|---|---|---|---|
| John Cirelli | 14991–82 | 1975 | $1,964.60 |
| Charles J. Cirelli and Martha C. Cirelli | 14992–82 | 1975 | 25,995.20 |
| Charles J. Cirelli & Son, Inc. | 15244–82 | 1975 | 25,087.86 |

The principal issue for decision is whether a partnership composed of Charles J. and Martha C. Cirelli's five children is valid for Federal income tax purposes for 1975.[2] Because of our disposition of the principal issue, we must also determine who shall be treated, for tax purposes, as owning C Equipment Co.'s property, whether amounts paid by Charles J. Cirelli & Son, Inc., to C Equipment Co. are deductible as ordinary and necessary business expenses, and whether certain amounts are constructive dividends taxable to Charles J. Cirelli.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. All of the individual petitioners resided, and the corporate petitioner had its principal place of business, in Maryland when they filed their petitions herein.

Joyce Ann Cirelli, Lucia Ann Cirelli, Mary Cirelli, Barbara Leone, and John Cirelli (the children) are the children of Charles J. and Martha C. Cirelli. Jack Leone (Leone) is Barbara's husband. During 1972 through 1974, Charles J. Cirelli (sometimes referred to hereafter as Cirelli) owned 100 percent of Charles J. Cirelli & Son, Inc. (the Cirelli corporation or the corporation); in 1975, Cirelli owned 96 percent and Clayton Miller owned the remaining 4 percent. Cirelli served as the corporation's president.

The Cirelli corporation was, during 1972 through 1975, a general contractor engaged primarily in the construction of buildings for State and local Governments. The corporation reported taxable income of $32,166.44 in 1972, $33,747.54 in 1973, $120,464.56 in 1974, and $93,081.01 in 1975. The Cirelli

---

[2]Charles J. and Martha C. Cirelli have not argued, other than in their petition to this Court, that a $200 deduction for safety shoes and equipment disallowed by respondent was properly deducted; no evidence was presented on this matter. Consequently, we find that the Cirellis have either conceded this issue or failed to carry their burden of substantiating this deduction.

corporation's working capital at the end of each year, i.e., current assets less current liabilities, increased as follows for the years 1970 through 1975:

| Year | Working capital | Increase in working capital | Percentage increase in working capital |
|------|-----------------|-----------------------------|-----------------------------------------|
| 1970 | $102,782 | | |
| 1971 | 223,870 | $121,088 | 118% |
| 1972 | 456,535 | 232,665 | 104 |
| 1973 | 464,567 | 8,032 | 2 |
| 1974 | 843,622 | 379,055 | 82 |
| 1975 | 2,247,586 | 1,403,964 | 166 |

On or about August 1, 1972, Barbara Leone, John Cirelli, Joyce Ann Cirelli, and Martha C. Cirelli, as custodian for Lucia Ann and Mary Cirelli, signed an agreement creating C Equipment Co. (the partnership), a partnership under Maryland law.[3] Each of the children had a 20-percent interest in the partnership. None of the children contributed any capital to the partnership between 1972 and 1975. The partnership was initially funded by a $5,000 loan from Cirelli on August 18, 1972, which was subsequently repaid in 1972.

The ages of the children (four of whom lived with the elder Cirellis during the taxable years at issue) as of the creation of the partnership and as of January 1, 1975, were as follows:

| | Aug. 1, 1972 | Jan. 1, 1975 |
|---|---|---|
| Barbara Leone | 20 | 22 |
| John Cirelli | 17 | 20 |
| Joyce Ann Cirelli | 15 | 18 |
| Mary Cirelli | 11 | 13 |
| Lucia Ann Cirelli | 7 | 9 |

Neither Cirelli nor his wife was a partner in C Equipment Co. in an individual capacity. The partnership agreement provided that a partner could dispose of his or her partnership interest subject to the other partners' right of first refusal to purchase the interest at 3 times the offering partner's interest

---

[3]Our references in this opinion to C Equipment Co. as "the partnership" are for convenience only and should not be interpreted as recognizing the partnership's validity for Federal tax purposes. The same is true with respect to references such as "sale," "purchase," "acquire," "lease," and "rent" or variants thereof.

in the partnership's book value.[4]

The partnership was formed, according to Cirelli, to involve his children in the construction business and "give them something that they would be able to use later on in their life." Between 1972 and 1975, the partnership "purchased" construction equipment and certain other items and "leased" them at a fair rental only to the Cirelli corporation; the alleged business reason for the corporation's entering into these leases was to improve its bonding capacity. The "purchases" and "leases" by the partnership extended only to a portion of the equipment used by the Cirelli corporation. At all times during the taxable years at issue, the corporation itself owned the construction equipment.

No other business was conducted by the partnership during these years.

The partnership's property was always under the physical control of the Cirelli corporation; the partnership did not own or lease any premises where heavy equipment could be stored and did not own equipment capable of transporting such equipment. The partnership lacked the ability to acquire unsolicited business, as it had no telephone listing in its own name and did not hold itself out to others as being engaged in the equipment leasing business.

The partnership's leasing activities generated the following taxable income between 1972 and 1975: $5,288 in 1972, $16,824 in 1973, $35,197 in 1974, and $36,773 in 1975.[5] The only distributions made by the partnership, other than for the children's taxes and educational expenses,[6] was an unexplained, 1-time distribution of $2,500 to Barbara in 1975.

Cirelli viewed his role in the partnership as "advisory * * * because they [the children] were young at the very beginning";

---

[4]The right of first refusal would be waived if the partnership interest was conveyed to the partner's parents, surviving spouse, descendants, and/or a charitable corporation controlled by any of them.

[5]The partnership reported total income of $7,004.95 and total deductions of $1,717.37 ($475.83 in finance charges, $1,235.89 in depreciation, and $5.65 in bank charges) in 1972; total income of $22,613.08 and total deductions of $5,789.58 ($1,596.88 in finance charges and $4,192.70 in depreciation) in 1973; total income of $44,764.65 and total deductions of $9,567.42 ($2,775.10 in finance charges, $163.28 in taxes, $6,306.04 in depreciation and $323 in insurance) in 1974; total income of $63,102.85 and total deductions of $26,329.78 ($1,040 in rent, $4,438.89 in finance charges, $2,383.48 in taxes, $5,720.12 in repairs, $10,566.55 in depreciation, and $2,180.74 in other deductions) in 1975.

[6]Distributions for Federal and State taxes and for education for each partner for each year are as follows:

he received no income from the partnership for his services. According to Cirelli, his oldest child, Barbara, was "basically" the partner with "principal authority" for partnership decisions.[7] Partnership "meetings" were "held" at the Cirelli residence during the Sunday evening meal, at which time Cirelli "presented" his children with his views, which were never objected to, on what the partnership should do. Nevertheless, Cirelli in fact had total control over the partnership's affairs. He negotiated every sale to the partnership; he determined what the market rental rate was on each piece of equipment owned by the partnership; he signed every partnership check between 1972 and 1975[8] and thereby controlled the partnership's distributions to its partners; his secretary, who was an employee of the corporation, recorded every partnership check in a check ledger.[9]

On August 10, 1972, the Cirelli corporation entered into a purchase agreement with the Milton James Co. for a John Deere loader for $20,763 (plus tax) less a trade-in of $4,082.28 on a similar loader owned by the corporation. On August 18, 1972, the Milton James Co. issued a purchase invoice (sale

| Year | Total | Barbara | John | Joyce Ann | Lucia Ann | Mary |
|---|---|---|---|---|---|---|
| 1972 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1973 | | | | | | |
| Federal | $338 | 0 | $101 | $79 | $79 | $79 |
| State | 10 | $10 | 0 | 0 | 0 | 0 |
| 1974 | | | | | | |
| Federal | 2,478 | 660 | 1,168 | 260 | 130 | 260 |
| State | 1,023 | 340 | 289 | 88 | 218 | 88 |
| Education | 4,092 | 0 | 3,821 | 271 | 0 | 0 |
| 1975 | | | | | | |
| Federal | 7,883 | 1,200 | 1,702 | 1,764 | 1,601 | 1,616 |
| State | 4,479 | 2,100 | 663 | 610 | 551 | 555 |
| Education | 4,085 | 0 | 3,155 | 930 | 0 | 0 |

[7] The partnership agreement provided that Barbara, as managing partner, had authority to make all decisions relating to the management and affairs of the partnership in the ordinary course of business. Major decisions, such as the sale of partnership equipment, required the consent of partners with partnership interests totaling more than 50 percent.

[8] Petitioners contend that Cirelli did not have exclusive authority over the partnership bank account. The only evidence of record, aside from the fact that Cirelli signed all checks, is testimony of Leone that he acquired signing authority some time between 1976 and 1978. Petitioners have not carried their burden of proof with evidence to support their contention. Rule 142(a), Tax Court Rules of Practice and Procedure.

[9] The partnership maintained no other books and records, except for summaries needed to complete partnership tax returns. These summaries, which were "supervised" by Barbara, were submitted to the accountant hired by the Cirelli corporation to do its corporate tax returns, who then prepared the partnership returns at no charge to either the partnership or the corporation.

price $20,763) to the partnership for the very loader contracted for by the Cirelli corporation 8 days earlier. On August 22, 1972, the Milton James Co. paid the Cirelli corporation $4,082.28 for the loader it originally traded in. On the same day, the partnership paid the Milton James Co. $4,082.28, presumably out of funds loaned to it by Cirelli (see p. 337 *supra*) and financed the balance of the loader's purchase price.[10] Although the partnership only paid monthly installments of $582.31 on the loader, the corporation rented it from the partnership under a month-to-month verbal agreement for $1,456 per month.

On December 27, 1972, a lease with purchase option on a Mustang loader s.n. 10521 was entered into in the partnership's name with the Free State Equipment Co. (Free State). During 1973, the partnership paid Free State $5,200 under the lease and then exercised the purchase option and acquired clear title to the loader by making a final payment, in December 1973, to Free State of $476.20. Under a month-to-month verbal agreement, the Cirelli corporation paid the partnership $520 per month (or $6,760 for the 13-month period of December 1972 through December 1973) for use of this loader, which it could have purchased outright for over a thousand dollars less.

On September 8, 1973, the Cirelli corporation entered into a contract to purchase an office condominium in Florida so that the corporation would have an office for the branch it was starting in Florida. Cirelli later decided to have the partnership purchase the condominium. Consequently, at some point, the partnership acquired the property.[11] It appears that Cirelli personally paid $20,198 for the condominium, since, on March 5, 1974, Barbara signed a promissory note obligating the partnership to pay Cirelli the purchase price plus interest; payments on the note were to be made "upon mutual agreement between the holder and maker of this note." The

---

[10]The balance was financed, through the Milton James Co., with Commercial Credit Equipment Co. During 1972 through 1975, the Milton James Co. was not primarily concerned with a construction equipment purchaser's creditworthiness so long as the buyer put 25 percent down on the equipment, because the resale market for those products was such that the equipment could easily be resold for the amount owed.

[11]No documentation of such purchase by the partnership was ever presented to this Court. A closing statement dated Dec. 6, 1973, listed the buyer as "Cirelli." A closing statement of the later sale of the condominium dated May 12, 1978, listed C Equipment Co. as the seller.

partnership's records indicate that payments on the note were made at a monthly rate of $522.70. The condominium was rented to the corporation for $500 per month.

On May 13, 1974, the Cirelli corporation transferred to the partnership a Lull 7C Lift, which it owned, for $5,500 payable on account. The partnership traded in this lift for a Mustang loader s.n. 11292, which it rented to the corporation. The corporation paid the partnership $750 per month from May 13, 1974 through 1975, for the use of the loader. The partnership made no payment to the corporation on the $5,500 account payable in 1974; this account was apparently paid off in July 1975 (after the corporation had paid the partnership almost twice that amount for the loader's use).

On August 31, 1974, the partnership acquired from the corporation a Melrose 600 Bobcat for $2,500, which was paid for on October 28, 1974. The corporation paid $750 per month rent from September 1974 through December 1975 (or a total of $12,000) for use of the Bobcat.

In 1975, while Cirelli was in Florida, he purchased a yacht (named by him the "Lady C"), which was being sold in a "distress sale," because it "looked like a good buy" and could be used in a yacht chartering service. On April 4, 1975, a corporate employee made a $5,000 deposit by corporate check on the "Lady C." The partnership's books indicate that on April 15, 1975, its cash account was debited by a $50,000 receipt from the Cirelli corporation[12] and credited by a $45,000 check payment to the ship's prior owner.

The yacht was sailed by Cirelli and others to Annapolis, Md., and docked at Cirelli's residence.[13] During 1975, the only persons to rent the yacht were Cirelli and the corporation.[14] Cirelli kept the ship's log.

On November 18, 1975, the corporation purchased a backhoe and tractor for $4,500. Subsequently, the corporation paid the partnership for the use of this backhoe.[15]

---

[12]It appears from the testimony of Cirelli that this amount was intended to be a loan from the corporation and that it was subsequently repaid, but the record is unclear as to if and when such repayment occurred.

[13]Cirelli charged the partnership $1,040 in 1975 for dockage fees.

[14]The partnership charged the corporation $5,000 for 20 rentals and charged Cirelli $1,500 for 6 rentals.

[15]It is unclear from the record what rent was charged and if or how the partnership acquired title to this property.

ULTIMATE FINDINGS OF FACT

C Equipment Co. was a sham and consequently not a valid partnership for Federal income tax purposes.

The yacht "Lady C" was not owned and operated for profit but for the personal benefit of Charles J. Cirelli.

OPINION

We must first determine whether C Equipment Co. was a valid partnership for Federal income tax purposes in 1975. Respondent argues that we should focus on Cirelli's control over the partnership and, applying the doctrine of substance over form, reject Cirelli's attempt to direct the corporation's income to his (lower tax bracket) children.[16] Petitioners contend, on the other hand, that the Cirelli children in fact functioned as partners and should be recognized as such. The burden of proof is on the petitioners. Rule 142(a).[17]

Neither party disputes the fact that capital was a material income-producing factor in the ownership and leasing of equipment such as is involved herein. Section 704(e)(1) provides:

SEC 704. PARTNER'S DISTRIBUTIVE SHARE.
  (e) FAMILY PARTNERSHIPS—
    (1) RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

Petitioners contend that section 704 is inapplicable "because it does not provide for allocation of income to persons who are not members of the Partnership. The Corporation is not a member of the Partnership, and thus, sec. 704 can not be invoked to reverse the alleged 'conduit' from the Corporation to the Partnership." Petitioners thus apparently contend that

---

[16] In *Snyder v. Westover*, 217 F.2d 928 (9th Cir. 1954), the so-called bogus family partnership was defined as "an illusory paper transaction for the sole purpose of splitting the income of the family business among the various members of the family group while retaining the control where it originally was, with the taxpayer, usually the father-husband." 217 F.2d at 932.

[17] All Rule references are to the Rules of Practice and Procedure of this Court, and all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue.

respondent is attempting to use the regulations under section 704(e) to allocate income to a nonpartner, i.e., the corporation, something he can do only by utilizing section 482 (allocation of income and deductions among taxpayers), a section respondent has not relied upon herein.[18] Petitioner misconstrues the thrust of respondent's arguments. Respondent is not contending that section 704(e) is directly applicable (an issue which we therefore need not decide).[19] He merely argues, and we agree, that the factors set forth in section 704(e) can be used as guides for determining whether a valid partnership existed. Moreover, we are satisfied that, irrespective of any direct or indirect use of section 704(e), the doctrine of substance over form has a pervasive application which cuts across any specific provision of the Code. See *Goldfine v. Commissioner*, 80 T.C. 843, 857–858 (1983) (doctrine of economic substance applies independently of section 704(b)); *Holladay v. Commissioner*, 72 T.C. 571, 586–588 (1979), affd. 649 F.2d 1176 (5th Cir. 1981) (same).[20]

Whether a "partner" owns "a capital interest in a partnership" (the phrase utilized in sec. 704(e)) is a factual issue to be determined from the totality of the circumstances. Sec. 1.704–1(e), Income Tax Regs.; *Ginsberg v. Commissioner*, 502 F.2d 965, 967 (6th Cir. 1974), affg. a Memorandum Opinion of this Court; *Pflugradt v. United States*, 310 F.2d 412, 416 (7th Cir. 1962); *Ketter v. Commissioner*, 70 T.C. 637, 643 (1978), affd. without published opinion 605 F.2d 1209 (8th Cir. 1979). Family partnerships must be closely scrutinized by the courts, since the family relationship "so readily lends itself to paper arrangements having little or no relationship to reality." *Kuney v. Frank*, 308 F.2d 719, 720 (9th Cir. 1962). See also *Commissioner v. Culbertson*, 337 U.S. 733, 746 (1949); S. Rept. 781, 82d Cong., 1st Sess. 38–40 (1951), 1951–2 C.B. 458,

---

[18] See *Foster v. Commissioner*, 80 T.C. 34, 143 (1983), and cases cited thereat, on appeal (9th Cir., Sept. 30, 1983).

[19] See, however, *Ketter v. Commissioner*, 70 T.C. 637 (1978), affd. without published opinion 605 F.2d 1209 (8th Cir. 1979).

[20] We are confirmed in our approach by the legislative history of sec. 704's predecessor, which focused on whether a "partner" is the "real owner" of the partnership interest and states that "The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham." S. Rept. 781, 82d Cong., 1st Sess. 39 (1951), 1951–2 C.B. 458, 486; H. Rept. 586, 82d Cong., 1st Sess. 33 (1951), 1951–2 C.B. 357, 381. See also *Spiesman v. Commissioner*, 260 F.2d 940, 947–948 (9th Cir. 1958), affg. 28 T.C. 567 (1957).

485–486; H. Rept. 586, 82d Cong., 1st Sess. 32–34 (1951), 1951–2 C.B. 357, 380–381; W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 14.01 (1977) (hereinafter McKee). "Mere shams" will not be recognized for Federal tax purposes. *Spiesman v. Commissioner*, 28 T.C. 567 (1957), affd. 260 F.2d 940 (9th Cir. 1958); *Fiore v. Commissioner*, T.C. Memo. 1979–360, affd. without published opinion 636 F.2d 1208 (3d Cir. 1980).

Two preliminary matters need to be addressed. First, petitioners argue that the formation of the partnership had a business purpose—to establish an entity from which the Cirelli corporation could lease equipment; by leasing rather than purchasing equipment, so the argument goes, the Cirelli corporation could improve its working capital and thereby increase its bonding capacity. We find the bonding capacity argument meritless. In many of these transactions (for example, the Mustang loader s.n. 10521 and the Melrose 600 Bobcat), the corporation's bonding capacity suffered more from leasing the property, because the corporation paid more in the first year to rent the equipment than it would have cost to purchase (or keep) it. Moreover, even in those instances in which the corporation's bonding capacity may have been improved vis-à-vis purchasing the property directly, the amount of cash saved was insignificant when compared to the corporation's existing bonding capacity (see pp. 336–337 *supra*) and could not have been a good-faith reason for the transactions.

We recognize that, in applying section 704(e), the test may no longer be "whether the parties acted in good faith *with a business purpose* in joining together to conduct the partnership business." (Emphasis added.) See *Pflugradt v. United States*, *supra* at 415. However, we note that the foregoing language contains a dual standard, i.e., "good faith," and "a business purpose." As a result, we think that, while "business purpose" may not have any independent significance under section 704(e), it is a relevant factor to be taken into account in determining whether the parties herein joined together in good faith. See p. 348 *infra*. This is particularly true where, as is the case herein, the petitioners have placed great emphasis

on the presence of such a purpose.[21]

The second preliminary matter concerns petitioners' contention that, since the partnership agreement provided that each partner had the right to sell his or her interest in the partnership, we must find that each partner in fact owned his or her capital interest. Petitioner's position is not valid. In *Ketter v. Commissioner, supra*, Ketter, who operated an accounting practice as a sole proprietorship, established trusts for his children and his college alma mater and then transferred to those trusts the work in progress of his accounting proprietorship and the employment contracts covering his employees. Each trust was irrevocable and could not be altered or terminated by the settlor. Furthermore, each provided that upon a beneficiary's death, the trust would terminate and its assets would be paid to the decedent's spouse and descendants. The initial trustee was Ketter's brother-in-law. The trusts then established a partnership to provide accounting services for accountants, transferred the work in progress and the employment contracts to the partnership, and hired Ketter as manager. The partnership never performed services for anyone but Ketter. This Court held that, notwithstanding the validity under State law of the transfers to the trusts (see also *Pflugradt v. United States, supra* at 417), Ketter's retention of no reversionary interest in the trusts, *and the trusts' rights under the partnership agreement to liquidate their interests*, the controls retained by Ketter and the manner in which the partnership conducted its business required that the trusts not be recognized under section 704(e) as owners of the partnership interests. See 70 T.C. at 648.

The regulations under section 704(e) list a series of factors to be considered in determining whether a partner is, in fact, the real owner of a capital interest in the partnership. The factors to be considered, which are illustrative rather than exhaustive (*Ketter v. Commissioner, supra*), break down into five categories: retained controls, indirect controls, participation in management, income distributions, and conduct of partnership business. See sec. 1.704–1(e)(2), Income Tax Regs.

---

[21]Technically, the business purpose asserted by petitioners was that of Cirelli and the corporation. But we think that, if such purpose existed, it could properly have been imputed to the children.

The critical fact in this case is the absolute control Cirelli exercised over every aspect of the partnership and its business. Notwithstanding the provision in the partnership agreement (and Cirelli's testimony) that Barbara was the partnership's managing partner, the facts clearly indicate that Cirelli, rather than any of his children, controlled C Equipment Co. to the point where the Cirelli children cannot be viewed as partners in the company.

Cirelli's testimony that he merely offered advice to his children and that they made the partnership (management) decisions is simply not borne out by the record. The idea to form the partnership was Cirelli's. He was the person who determined that the corporation needed a piece of equipment and that the partnership should acquire it. It appears from the record that, at least in the instance of the yacht,[22] and most likely in several (if not all) of the other transactions, Cirelli actually purchased the property without conferring with C Equipment Co.'s partners. Moreover, even if the children were presented with the details of a particular transaction before it was entered into, they would have had absolutely no reason to disagree with Cirelli's "advice," and the record contains no evidence to indicate that they ever exercised any independent judgment. Since every piece of construction equipment purchased by the partnership was continuously rented by the Cirelli corporation[23] and since the "fair rental values" of the properties were, for the most part, greatly in excess of the partnership's contractual obligations to pay for such properties, the partnership was, in effect, guaranteed a no-risk profit.

Cirelli's control over the property after it was purchased is also important. The partnership never leased its property between 1972 and 1975 to anyone other than the Cirelli corporation; indeed, Cirelli would never have caused the partnership to acquire property he did not anticipate the corporation would have a continuing use for. Moreover, the

---

[22]The only evidence that the partners may have been consulted in advance about the yacht's purchase is the vague testimony of John Cirelli, which appears inconsistent with the implications of Charles Cirelli's testimony about purchasing the yacht at a distress sale while he was in Florida.

[23]The condominium was apparently rented to others after the Cirelli corporation closed its business efforts in Florida. However, problems with the tenants developed, and it was decided in 1978 to sell the condominium rather than deal with clients who paid their bills less promptly than the Cirelli corporation. The only other piece of nonconstruction property purchased by the partnership was the yacht, which was chartered in 1975 only by Cirelli (both for personal and allegedly "corporate" uses, see pp. 350–351 infra).

partnership lacked the ability to store or transport its equipment and hence could not take possession of equipment no longer needed by the corporation, store the equipment, or transport it to other possible lessees.

The manner in which the partnership's business was conducted is also indicative of the children's status as nonpartners. Petitioners have presented no evidence that the children participated in any of the transactions between C Equipment Co. and those who sold or financed the property purchased by the partnership. Statements which Cirelli might have made to these persons, most of whom he had previously dealt with in his capacity as president of the Cirelli corporation, to the effect that he was acting as an agent for a partnership composed of his children, would be insufficient, in and of themselves, to establish that the children in fact owned interests in the partnership; such a simple requirement would, in this case, elevate form over substance.[24] Moreover, the partnership did not, between 1972 and 1975, attempt in any way to acquire customers other than Cirelli and his corporation.

The corporation's distribution practices and recordkeeping procedures are also indicative of Cirelli's absolute control of C Equipment Co. Between 1972 and 1975, the partnership made distributions sufficient to cover only taxes owed by the children (see *Fiore v. Commissioner, supra*) and schooling expenses plus a $2,500 distribution to Barbara. This last distribution is the only one which we think could conceivably indicate that Cirelli lacked total control over partnership distributions, and yet petitioners made no effort to inform the Court of the facts surrounding the distribution. Moreover, Cirelli's control is indicated by the fact that he, a nonpartner, was the only person who was authorized to, and did, sign partnership checks between 1972 and 1975 (see p. 339 and note 8 *supra*) and by the fact that the general check ledger was kept by his secretary.

The final factor which persuades us that Cirelli completely controlled the partnership was Cirelli's inability, on the witness stand, to keep his or his corporation's actions separate from the partnership's actions. For example, Cirelli testified, in discussing the partnership's problems with renting out the

---

[24]Similarly, permitting the simple execution of a partnership agreement and the opening of a partnership checking account to control would elevate form over substance.

condominium after the corporation moved out, that "*we* had to appear in court and—well, they, you know, had to appear." (Emphasis added.) Similarly, in a classic Freudian slip, Cirelli testified that "we [the corporation] have leased our own equipment—I mean leased equipment from C Equipment Company." Such confusion would not have occurred if the children had exercised sufficient control over the partnership to justify treating them as owning their partnership interests.

We are satisfied that, under the guidelines articulated in the regulations under section 704(e), petitioners have failed to establish that C Equipment Co. was a valid, existing partnership during the years at issue. *Ketter v. Commissioner, supra.* We reach the same conclusion if we apply the subjective test of *Commissioner v. Culbertson*, 337 U.S. at 742, namely, "whether * * * the parties in good faith *and* acting with a business purpose intended to join together in the present conduct of the enterprise." (Emphasis added.) Compare *Poggetto v. United States*, 306 F.2d 76, 79–80 (9th Cir. 1962); Mckee, *supra* at par. 14.02. See also *Carriage Square, Inc. v. Commissioner*, 69 T.C. 119, 128 (1977). All of the considerations which led us to conclude that petitioners have not satisfied the guidelines of the regulations under section 704(e) are equally applicable in applying this test. Moreover, in the context of the foregoing language from *Culbertson*, the absence of business purpose has independent significance. See pp. 342–345 *supra*.

The long and the short of the matter is that petitioners have not carried their burden of proof that the Cirelli children joined together in good faith to form C Equipment Co. (the *Culbertson* test) or ever acquired ownership interests in the partnership (the sec. 704(e) test by analogy). Accordingly, we find that the partnership was a sham, i.e., nothing more than a conduit for the corporation created out of paper concepts and operated by Cirelli on behalf of the corporation in a manner which simply consisted of carrying on the business of the corporation as if such concepts did not exist. See *Kuney v. Frank, supra* at 720.

The net result of the foregoing is that the property "owned" by the partnership will for tax purposes be treated as owned by the corporation. As a consequence, the "rentals" paid by the corporation to the partnership for use of its own property cannot qualify under section 162 as ordinary and necessary

business expenses.[25] However, those deductible expenses and related tax benefits (e.g., investment tax credits) claimed by the partnership in connection with property owned, for tax purposes, by the corporation (other than those attributable to the yacht, see pp. 350–351 *infra*) will be allowed to the corporation, as respondent has done in the corporation's deficiency notice. Additionally, we note, at this point, that petitioners have presented no evidence to sustain the deduction by the corporation of $4,640.37 for auto and truck expenses and travel and entertainment expenses. Accordingly, the disallowance of that deduction is sustained. See also note 2 *supra*.

We turn now to the questions in respect of the yacht expenses. In his deficiency notices to the partners of C Equipment Co. respondent disallowed the deduction of $10,853 for yacht expenses, including depreciation. In his deficiency notice to the corporation, respondent disallowed $6,500 rental expense. In his deficiency notice to the Charles Cirellis, respondent included $9,813 of the yacht expenses as constructive dividends from the corporation.[26]

As to the deductibility of the expenses by the partnership, and hence the partners, since we have concluded that the partnership was a sham, the yacht expenses are clearly not deductible by it. The issue with respect to the deductibility of those expenses by the corporation resolves itself into two subsidiary questions: (a) Was the yacht used in a trade or business of the corporation, and (b) have the requirements of

[25]We would simply note that had we found a valid partnership for tax purposes, petitioners would still have had to overcome the argument that the rent was nondeductible because the sale-leasebacks should not be recognized for tax purposes. While some of the transactions may not have been sale-leasebacks in the technical sense of the term, the interrelationships between the corporation, the partnership, and the outside party were sufficiently entangled and the bonding capacity argument so meritless that we might well have found, had we been called upon to do so, that the Cirelli corporation purchased the properties from the outside parties, sold them to the partnership, and then leased them back but that the sales and leasebacks should not be recognized for tax purposes. See generally *Shaffer Terminals, Inc. v. Commissioner*, 16 T.C. 356 (1951), affd. per curiam 194 F.2d 539 (9th Cir. 1952); *Perry v. United States*, 520 F.2d 235 (4th Cir. 1975). Compare *Carroll v. Commissioner*, T.C. Memo. 1978–173 (bonding capacity argument found valid). That the leases involved herein provided for a fair rental would not have precluded us from reaching such a conclusion. *Shaffer Terminals, Inc. v. Commissioner, supra*; *Armston v. Commissioner*, 12 T.C. 539 (1949), affd. sub nom. *W. H. Armston Co. v. Commissioner*, 188 F.2d 531 (5th Cir. 1951).

[26]The only yacht expense that was disallowed to the partnership and not determined by respondent to be a constructive dividend to Cirelli was the $1,040 dock rental expense paid to Charles and Martha Cirelli which had already been included in their income.

section 274(a) been satisfied, since the yacht was, at best, an entertainment facility (see *Ashby v. Commissioner*, 50 T.C. 409 (1968))? We conclude that both questions should be answered in the negative.

The yacht was never advertised as being available for charter. It was never "chartered" by anyone other than Cirelli or the corporation. There is no evidence that there was any bona fide objective that the chartering service which was allegedly contemplated would be profitable, and the record indicates that in 1975 the operation of the yacht produced a substantial loss.[27] To be sure, the log of the yacht (kept by Cirelli) contains vague indications that it was used by the corporation to entertain persons purportedly having some business relationship to the corporation, but petitioner made no effort to flesh out such indications with any specifics with respect to those relationships. Moreover, the yacht was moored at Cirelli's home and there is evidence that the yacht was used on occasions not recorded in the log; for aught that appears, those occasions could have involved personal use by Cirelli or members of his family. In light of the foregoing and based upon our evaluation of the record as a whole, we are satisfied that petitioners have not carried their burden of proof that the yacht was acquired for any purpose other than the personal benefit of Cirelli. *Challenge Manufacturing Co. v. Commissioner*, 37 T.C. 650 (1962). At most, the use of the yacht by the corporation, if any, was incidental to such personal benefit. See *International Artists, Ltd. v. Commissioner*, 55 T.C. 94, 104–105 (1970). Consequently, we conclude that the corporation did not use the yacht in its trade or business within the meaning of section 162 and that none of the expenses relating to the yacht are deductible by it. *Transport Manufacturing & Equipment Co. v. Commissioner*, 434 F.2d 373, 377 (8th Cir. 1970), affg. a Memorandum Opinion of this Court; *International Trading Co. v. Commissioner*, 275 F.2d 578 (7th Cir. 1960), affg. a Memorandum Opinion of this Court; *American Properties, Inc. v. Commissioner*, 28 T.C. 1100 (1957), affd. per curiam 262 F.2d 150 (9th Cir. 1958); *Ashby v. Commissioner, supra*; *Carter v. Commissioner*, T.C. Memo. 1978–202, affd. 645 F.2d

---

[27]The partnership charged the Cirelli corporation $5,000 and Cirelli $1,500 for use of the yacht (see note 32 *infra*) and claimed deductible yacht expenses of $10,853 ($5,508 for repairs, $842 for insurance, $247 for gasoline, $1,040 for dock rent, and $3,216 for depreciation).

784 (9th Cir. 1981).[28] Moreover, the requirements of section 274 have clearly not been satisfied.

We must next determine whether any of the funds transferred from the corporation to the partnership are taxable to Cirelli as constructive dividends. Respondent determined in the deficiency notice that the $9,813.24 in yacht expenses, the $18,946.92 in cash disbursements by C Equipment Co. to the children,[29] and the $4,640.37 in auto and truck expenses and travel and entertainment expenses[30] constituted constructive dividends to Cirelli. For the reasons below, we agree.

It is clear that a distribution need not be to a shareholder to be taxable as a constructive dividend; the distribution need only be for the shareholder's benefit. *Engineering Sales, Inc. v. United States*, 510 F.2d 565 (5th Cir. 1975); *Hardin v. United States*, 461 F.2d 865, 871–873 (5th Cir. 1972); *Sparks Nugget, Inc. v. Commissioner*, 458 F.2d 631 (9th Cir. 1972), affg. a Memorandum Opinion of this Court. See *Jack's Maintenance Contractors, Inc. v. Commissioner*, 703 F.2d 154 (5th Cir. 1983), revg. a Memorandum Opinion of this Court.

We have already determined that the yacht served little, if any, business purpose but, rather, was utilized for the Cirelli family's personal enjoyment. Consequently, the yacht expenses determined by respondent to be constructive dividends are taxable to Cirelli.[31] See, e.g., *United Aniline Co. v. Commissioner*, 316 F.2d 701 (1st Cir. 1963), affg. a Memorandum Opinion of this Court; *Challenge Manufacturing Co. v. Commissioner, supra.* In this connection, we note that, while the proper measure of a constructive dividend, under the

---

[28]See also *Progressive Engineering, Inc. v. Commissioner*, T.C. Memo. 1975–82; *Hofmann Bros. Realty Corp. v. Commissioner*, T.C. Memo. 1963–320. *Bruce v. Commissioner*, T.C. Memo. 1956–96, and *Sprott v. Commissioner*, a Memorandum Opinion of this Court, dated Feb. 17, 1953, relied upon by petitioners, are clearly distinguishable on their facts.

[29]Respondent limited his assertion of a constructive dividend for 1975 (the only year before us in respect of Cirelli and his wife), to this amount, although his theory that the partnership was a sham might have supported an assertion of a constructive dividend in the total amount paid by the corporation to the partnership. The amount asserted is represented by the payments by the partnership in 1975 for taxes and the education of the children and the $2,500 to Barbara. See p. 338 *supra.*

[30]These expenses, which were listed in two groups (auto and truck expenses and travel and entertainment expenses) in the corporation's deficiency notice, were listed in Charles and Martha Cirelli's deficiency notice only as travel and entertainment expenses.

[31]Given the basis for our conclusion as to the purpose of the acquisition and operation of the yacht, we have no need to apply the rule that a disallowance of expenses under sec. 274 does not necessarily result in a constructive dividend. *Foster v. Commissioner*, 80 T.C. 34, 235 (1983), and cases cited thereat, on appeal (9th Cir., Sept. 30, 1983).

circumstances herein, is the fair market value of the use of corporate property, the petitioners have not carried their burden of proof that such fair market value is less than the $9,813 of yacht expenses which respondent determined to be the amount of the constructive dividend attributable to the yacht expenses.[32] *United Aniline Co. v. Commissioner, supra* at 703; *Challenge Manufacturing Co. v. Commissioner, supra* at 663. Compare *International Trading Co. v. Commissioner*, T.C. Memo. 1958–104, affd. on other issues 275 F.2d 578 (7th Cir. 1960). In view of our holding that the partnership was a sham, the amounts of cash distributed to the children constitute constructive dividends to Cirelli (see note 29 *supra*). *Engineering Sales, Inc. v. United States, supra; Hardin v. United States, supra; Sparks Nugget, Inc. v. Commissioner, supra.*[33] Finally, since petitioners have presented neither evidence nor argument that the auto and truck expenses and travel and entertainment expenses determined by respondent to be constructive dividends should not be so categorized, we find these amounts must also be included in Cirelli's income.

*Decisions will be entered under Rule 155.*

---

[32]At a fair rental of $250 per day (see note 14 *supra*), Cirelli would have had to use the yacht on only 40 occasions to have had the fair rental exceed the $9,813 expenses charged to him as a constructive dividend. That number of occasions is not so large as to make it unlikely that, on the basis of the record herein, the yacht would have been used that frequently by him. We note that Cirelli was "charged" $1,500 by the partnership for the use of the yacht on six occasions. However, the record does not show that such amount was in fact paid by Cirelli during 1975. Under these circumstances, Cirelli is not entitled to any credit for the $1,500 against the yacht expenses being charged to him as a constructive dividend.

[33]See also *Lasker v. Commissioner*, a Memorandum Opinion of this Court dated Jan. 23, 1952.